**FOURTH DIVISION
DILLARD, C. J.,
DOYLE, P. J., and MERCIER, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**September 28, 2018**

# In the Court of Appeals of Georgia

A18A0871. SOUTHWESTERN EMERGENCY PHYSICIANS, P.C., et al. v. QUINNEY et al.

DILLARD, Chief Judge.

Douglas L. Quinney and his wife filed a medical malpractice action against Southwestern Emergency Physicians, P.C., its employee, Raymond E. Gutierrez, M.D. ("Gutierrez"), Phoebe Putney Memorial Hospital (the "hospital"), and several of its employees, alleging that Dr. Gutierrez, *inter alia*, failed to provide Quinney with proper medical treatment while he was in the emergency department of the hospital and that this failure resulted in Quinney suffering irreversible paraplegia. Following trial, a jury rendered a verdict in favor of Quinney, and the trial court affirmed the verdict in its judgment. On appeal, Gutierrez contends that the trial court erred in (1) denying his request for a mistrial when Quinney questioned a witness

about a prior lawsuit against his practice group; (2) allowing Quinney to argue that an ordinary-negligence standard possibly applied to some aspects of the case despite an appellate ruling from this Court holding that a gross-negligence standard was applicable; (3) instructing the jury that a gross-negligence standard applied with regard to apportioning fault to non-parties; and (4) denying his request to include the hospital, as a separate entity from its employees, on the verdict form for apportionment of fault. For the reasons set forth *infra*, we affirm.

Construed in favor of the jury's verdict,[1] the record shows that on March 11, 2009, Quinney underwent surgery to have a spinal-cord stimulator placed in his back to relieve pain related to diabetic neuropathy. A neurosurgeon at Columbus Medical Center performed the surgery, and, immediately thereafter, Quinney was discharged and returned to his home in Albany, Georgia. Initially, Quinney seemed to be recovering well, but five days later, in the early morning hours of March 16, 2009, he awoke with severe pain in his back. Within minutes, Quinney's pain became even more intense, and he began noticing that his right leg was weakening to the extent that he was having difficulty standing. At that point, Quinney's wife called 911. And by the time the ambulance arrived, Quinney could no longer move his right leg and

---

[1] *See, e.g.*, *Harris v. Tutt*, 306 Ga. App. 377, 378 (1) (702 SE2d 707) (2010).

2

had to be lifted on to the ambulance's stretcher. The ambulance then transported Quinney to the hospital in Albany.

Quinney arrived at the hospital's emergency department just before 6:00 a.m. and was triaged by nurse David Stalvey. And although Quinney was screaming in pain, he informed Stalvey regarding his history of neuropathy and that he had recently undergone spinal-cord-stimulator-implant surgery. At 7:00 a.m., a shift change at the hospital resulted in nurse Elizabeth Kenja replacing Stalvey as Quinney's nurse. A few minutes later, Gutierrez examined Quinney, part of which included a neurologic examination to evaluate his alertness and motor deficits. Gutierrez was also informed regarding Quinney's recent surgery, and while Gutierrez's differential diagnosis included the possibilities of a spinal cord abscess or a spinal canal hematoma, he never performed a complete neurologic examination of Quinney. Instead, Gutierrez ordered a CT scan of Quinney's spine And after that scan was performed, the results were interpreted by Dr. Michael Baldwin, a radiologist at the hospital. But Baldwin found no evidence of an abscess or a spinal cord hematoma, and those findings were conveyed to Gutierrez. Over the course of the next couple of hours, Gutierrez looked in on Quinney a few more times, noted that he remained symptomatic, but conducted

3

no additional physical or neurological examinations and did not consult with the neurosurgeon on call at the hospital.

Thereafter, despite the fact that he never determined the cause of Quinney's severe back pain and was unable to alleviate it with narcotic pain medications, Gutierrez believed Quinney was stable enough to be transferred. And as a result, at 9:22 a.m., he signed off on an order for Quinney to be transferred to Columbus Medical Center for examination by the neurosurgeon who performed the implant surgery. Nevertheless, Quinney remained at the hospital until approximately 12:40 p.m. before actually being transferred by ambulance to Columbus Medical Center. Upon Quinney's arrival, his neurosurgeon ordered a CT myelogram scan, and that test revealed a spinal canal hematoma compressing Quinney's spine, which had not been diagnosed by Gutierrez, Baldwin, or anyone else at Phoebe Putney Hospital. The neurosurgeon immediately performed surgery to remove the hematoma, but by that point the damage to Quinney's spine could not be repaired, rendering him irreversibly paralyzed from the waist down and wheelchair bound for the remainder of his life.

Subsequently, Quinney and his wife filed a medical-malpractice action against Gutierrez, his practice group, Southwestern Emergency Physicians, P.C., and Phoebe Putney Memorial Hospital, alleging that Gutierrez failed to provide Quinney with

4

proper medical treatment while he was in the emergency department of the hospital and that this failure resulted in the spinal canal hematoma going untreated long enough for it to damage his spine and render him irreversibly paraplegic. Those initial defendants filed answers, and not long thereafter, Quinney moved successfully to also add Nurses Stalvey and Kenja as defendants. Stalvey and Kenja then also filed answers and discovery ensued.

Following a few depositions, the defendants moved for summary judgment, arguing that the Quinney's negligence claims arose solely out of the provision of emergency medical care and, thus, were subject to the gross-negligence standard mandated by the so-called "ER statute," OCGA § 51-1-29.5. The trial court granted the defendants' motion, and Quinney appealed, arguing that OCGA § 51-1-29.5 was not applicable to his claims and, alternatively, if the statute did apply, that there was sufficient evidence of gross negligence to create a jury issue. And in *Quinney v. Phoebe Putney Memorial Hospital, Inc.* ("*Quinney I*"),[2] we affirmed the trial court in part and reversed it in part, holding that the services rendered by the defendants constituted emergency medical care and, thus, OCGA § 51-1-29.5 applied,[3] but that

[2] 325 Ga. App. 112 (751 SE2d 874) (2013).

[3] *See id.* at 116-17 (1).

5

fact issues remained as to whether the defendants had been grossly negligent in treating Quinney and, therefore, summary judgment was not warranted.[4]

The case was remitted to the trial court, and discovery continued. Then, after numerous additional depositions, the defendants filed a notice that they would attempt to apportion fault to Baldwin, the hospital's radiologist, based on their allegations that Quinney's injuries were also a result of Baldwin's misreading of the CT scan and failing to recognize the existence of the spinal canal hematoma. And a few weeks prior to the start of trial, Quinney filed a motion to dismiss with prejudice Nurse Stalvey, Nurse Kenja, and Phoebe Putney Hospital, which the trial court granted.

Subsequently, the case proceeded to a nearly week-long jury trial, during which Quinney and his wife testified, and both the plaintiffs and Gutierrez presented expert testimony from several physicians regarding the treatment provided to Quinney and whether it constituted gross negligence. In addition, Gutierrez and Nurse Stalvey testified as to the specific treatment they provided to Quinney. At the conclusion of the trial, the jury rendered a verdict in favor of Quinney and awarded him $4,500,000 in damages. And specifically, on the verdict form, the jury apportioned 34 percent of

[4] *See id.* at 117-20 (2).

6

the fault to Gutierrez, 33 percent to non-party Nurse Kenja, 33 percent to non-party Baldwin, and zero percent to non-party Nurse Stalvey.

Shortly thereafter, the trial court issued a judgment, affirming the jury's verdict in favor of Quinney and its apportionment of damages. Gutierrez then filed a motion for new trial, to which Quinney filed a response. But ultimately, the trial court denied Gutierrez's motion. This appeal follows.

1. Gutierrez first contends that the trial court erred in denying his request for a mistrial when Quinney's counsel questioned an expert witness about a prior lawsuit against his practice group. We disagree.

When ruling on a motion for mistrial, a trial court is "vested with broad discretion, and this Court will not disturb the ruling absent a manifest abuse of discretion."[5] And in reviewing the trial court's refusal to grant a mistrial, we consider whether "the remarks affected or infected the verdict, and whether it is apparent that a mistrial is essential to the preservation of the right to a fair trial."[6]

_____

[5] *Ga. Dep't of Corr. v. Couch*, 312 Ga. App. 544, 548 (2) (718 SE2d 875) (2011); *see Bulgin v. Ga. Dep't of Transp.*, 292 Ga. App. 1, 4 (5) (663 SE2d 730) (2008) (holding that the trial court is vested with discretion in determining whether to grant a mistrial, and we review its ruling in this regard for abuse of discretion).

[6] *Couch*, 312 at 548 (2) (punctuation omitted); *see Issa v. State*, 340 Ga. App. 327, 338 (5) (796 SE2d 725) (2017) (holding that an "appellate court will not

In this matter, shortly before trial, Gutierrez filed a motion in limine, in which he sought to preclude the admission of any evidence of other lawsuits or malpractice claims against him or his practice group. Quinney consented to the motion, and no further action was taken at that time. But in his counsel's cross-examination of Gutierrez's first expert witness, the following colloquy occurred:

> Q. And you're not a stranger to [defense counsel], are you?
>
> A. No, sir.
>
> Q. In fact, you've worked for [defense counsel] or you've reviewed a case that involved Dr. Gutierrez's old emergency practice group here in town before?
>
> A. Yes.

Subsequently, after asking a couple of questions about being a medical expert and whether he had testified at a trial before, Quinney's counsel asked Gutierrez's expert the following:

> Q. When you were first asked to review this case, you already knew that the defendant doctor was from the same group that you had

interfere with the trial court's exercise of that discretion unless it is clear that a mistrial was essential to preserve the right to a fair trial" (punctuation omitted).

8

worked with [defense counsel] on the other case; right? Southwest Emergency Physicians.

A. I believe I did.

Q. You also knew that [defense counsel] is a doctor defense lawyer?

A. Yes.

Q. And you knew that the case involved a bad outcome from emergency care like the other case?

A. Well, it's not clear whether that outcome arose from the emergency care; that's why we're here. . . .

Gutierrez's counsel did not immediately move for a mistrial or even object to these questions, despite objecting to a different line of questioning just a few minutes later. But much later, after the trial court had the jury take a break so that the court could ask about the relevance of scans ordered by Quinney's Columbus neurosurgeon, Gutierrez's counsel moved for a mistrial based on his assertion that Quinney's counsel violated the motion in limine by questioning the defense expert about a prior case involving Gutierrez's practice group. The trial court recalled the colloquy in

9

question, but did not say anything at the time when Gutierrez's counsel did not object. Nevertheless, the trial court denied Gutierrez's motion for mistrial, and Gutierrez maintains that the court erred in doing so.

Under Georgia law, as a general rule in all negligence actions, "evidence of similar acts or omissions is not admissible."[7] This is so because the issue to be tried is "only the negligence or nonnegligence of the defendant at the time of the alleged negligent act, which must be determined by the circumstances surrounding that act and not by reputation of the alleged tortfeasor."[8] But here, although Quinney's counsel's two brief references to another "case" in the above-referenced colloquies were arguably improper, the references did not explicitly impute any prior negligence to Gutierrez or indicate that *he* had previously been sued. As a result, within the context of a nearly week-long trial, such references were insufficient to fatally infect the verdict and require a mistrial.[9] Indeed, upon review of the entirety of the trial

---

[7] *Carlisle v. Abend*, 288 Ga. App. 150, 151 (2) (653 SE2d 388) (2007) (punctuation omitted). *See generally* OCGA § 24-4-404 (a) ("Evidence of a person's character or a trait of character shall not be admissible for the purpose of proving action in conformity therewith on a particular occasion . . . .").

[8] *Carlisle*, 288 Ga. App. at 151 (2).

[9] *See Couch*, 312 Ga. App. at 548-49 (2) (holding that trial court did not abuse its discretion in denying defendant's request for a mistrial despite admission into

transcript, we cannot conclude as a matter of law that Gutierrez "suffered wrong or oppression as a result of the trial court's exercise of discretion, which is what we must conclude in order to interfere with that discretion."[10] Accordingly, the trial court did not abuse its discretion in denying Gutierrez's request for a mistrial.

2. Gutierrez also contends that the trial court erred in allowing Quinney to argue that an ordinary-negligence standard possibly applied to certain aspects of the case despite this Court's holding in *Quinney I* that only a gross-negligence standard applied. We disagree.

---

evidence of deposition testimony from non-testifying expert, in which he stated his opinion that defendant was liable for plaintiff's injury, because although evidence was prejudicial, brief reference did not fatally infect the jury's verdict); *Mon Ami Int'l, Inc. v. Gale*, 264 Ga. App. 739, 744 (4) (592 SE2d 83) (2003) (affirming trial court's denial of defendant's request for mistrial after plaintiff's counsel made reference to plaintiff's decedent's murder on defendant's property despite motion in limine prohibiting same as irrelevant to contract dispute). *Cf. Taylor v. Race Trac Petroleum, Inc.*, 238 Ga. App. 761, 762-63 (1) (519 SE2d 282) (1999) (holding that repeated references to decedent's prior drug use and reckless behavior constituted improper character evidence in decedent's estate's dram-shop liability claim against defendant that warranted a new trial); *Williams v. Naidu*, 168 Ga. App. 539, 540-41 (309 SE2d 686) (1983) (holding that specific testimony by the two defendant physicians in malpractice action that they had never been sued before was improper and warranted retrial).

[10] *Defusco v. Free*, 287 Ga. App. 313, 315-16 (651 SE2d 458) (2007).

11

As discussed *supra*, in *Quinney I*, this Court held that the treatment provided to Quinney by the defendants constituted emergency medical care and, thus, the gross-negligence standard outlined in OCGA § 51-1-29.5 applied in this case.[11] In light of this ruling, prior to trial, Gutierrez filed a motion in limine seeking to preclude Quinney from offering argument or evidence that a finding of ordinary negligence would support a plaintiffs' verdict , but the trial court denied this motion. And just prior to opening statements, the court explained that following *Quinney I*, two of Gutierrez's experts, who had not previously been deposed, testified that at the time Quinney was transferred to Columbus Medical Center, he was stable. Consequently, the court further explained that it would wait to see how the evidence unfolded at trial before determining whether to instruct the jury only as to gross negligence or as to both gross and ordinary negligence.

Following this explanation, the trial court suggested that if both parties refrained from discussing the standard of care during their opening statements, it would not be necessary to provide the jury with a preliminary instruction regarding the two different standards, but Gutierrez's counsel objected, stating that he intended to talk about the gross-negligence standard and the Quinneys' burden to meet it.

---

[11] *See supra* note 3 and accompanying text.

Agreeing with Quinney's counsel that mentioning ordinary negligence during opening statements was fair game if Gutierrez's counsel discussed gross negligence, the trial court informed the parties that it would preliminarily instruct the jury that both standards may be applicable depending on the evidence at trial. And thereafter, without defining either standard of care, the trial court instructed the jury prior to opening statements that there would probably be a dispute as to what burden of proof and standard of care would apply, but that the court would decide the issue after hearing the evidence and would instruct the jury accordingly before deliberations.

Subsequently, during Quinney's opening statement, his counsel remarked as follows:

> We're going to prove to you that Dr. Gutierrez was negligent, he's grossly negligent by whatever standard and burden of proof the Judge tells you, we're going to meet that. You can call it whatever you want to call it. You can call it clear and convincing, you can call it preponderance, you can even call this beyond a reasonable doubt in a criminal case, if you want to. We're going to meet that burden of proof and that evidence that I've just gone over with you that we're going to present on this witness stand is going to show you that. So take whatever burden of proof you want to, we accept it. This case meets any standard, any standard, any standard.

And later, during the direct examination of one of Quinney's experts, the following colloquy occurred.

Q. After review of those medical records and review of the depositions, did you reach any opinions regarding Mr. Quinney's care and treatment by the defendant, Dr. Gutierrez?

A. Yes, I did.

Q. What are those opinions?

A. I believe that the care rendered by Dr. Gutierrez was not within the standard of care.

Q. Explain what you mean by standard of care.

A. Standard of care is what an average, reasonably trained emergency physician would do given a similar set of circumstances and resources.

But throughout the remainder of the trial, the evidence presented by the parties—as Gutierrez acknowledges—focused on whether Gutierrez, the nurses, and Baldwin's treatment of Quinney amounted to gross negligence. And during the charge conference, Quinney's counsel withdrew their contention that ordinary negligence applied to certain aspects of the case and agreed that the jury should be

14

charged solely as to gross negligence. Consequently, the trial court instructed the jury that it was Quinney's burden to show by clear and convincing evidence that Gutierrez's treatment constituted gross negligence.

Gutierrez now argues that given this Court's holding in *Quinney I*, the trial court erred in failing from the very start of trial to preclude any argument or evidence regarding ordinary negligence and further contends that Quinney's counsel's opening statements referencing both standards of care and the above-referenced direct examination of Quinney's expert witness confused the jury regarding the applicable standard of care to the extent that a new trial is required. But pretermitting whether the trial court erred by not initially ruling that only the gross negligence standard of care applied, any potential confusion resulting from the trial court's initial failure to preclude references to ordinary negligence was "remedied through the use of careful jury instructions."[12] Indeed here, in its preliminary instructions, the trial court instructed the jury that neither counsels' opening statements, closing arguments, nor questions asked of witnesses constituted evidence. And in its final jury instructions,

---

[12] *Condra v. Atlanta Orthopaedic Group, P.C.*, 285 Ga. 667, 672 (1) (681 SE2d 152) (2009); *see Howland v. Wadsworth*, 324 Ga. App. 175, 182 (4) (749 SE2d 762) (2013) (noting that trial court's entire jury instruction resolved any ambiguity in earlier instruction).

15

the court reiterated this point, charging "[e]vidence does not include the opening statements and closing arguments."[13] Moreover, in its final jury instructions, the trial court made no mention of ordinary negligence being applicable, but rather specifically charged the jury as follows:

> In this case, in order for the defendants to be held liable, there must be clear and convincing evidence that the defendant physician Gutierrez was grossly negligent and deviated from the applicable standard of care.

Subsequently, after instructing the jury that Quinney had the burden of proving his case by clear and convincing evidence and explaining what that burden entailed, the trial court continued:

> Under Georgia law, the absence of slight care is termed gross negligence. In general, slight diligence or care is the degree of care that persons of common sense, however inattentive they may be, use under the same or similar circumstances.

---

[13] *See Young v. Griffin*, 329 Ga. App. 413, 416-17 (2) (765 SE2d 625) (2014) (holding that even though defense counsel's remarks during closing argument, to which plaintiff did not object, were improper, there was not a reasonable probability that arguments affected trial result given that trial court instructed the jury that what lawyers said in trial was not evidence).

16

If the defendant physician Gutierrez in the treatment and care of a patient should use at least slight diligence, then the physician would not be grossly negligent and there could be no finding of liability as to these defendants. If, on the other hand, the defendant physician would be grossly negligent, and if injury resulted because of such gross negligence, the physician or healthcare provider would be liable for such injury.

After charging the jury on credibility and the role of expert witnesses, the court explained:

Members of the jury, it is my duty and responsibility to ascertain the law applicable to this case to instruct you on that law, by which you are bound. That's what I'm doing right now. As the jury, it is your responsibility to ascertain the facts of the case from all the evidence presented. It then becomes your duty and responsibility to apply the law I give you in the charge to the facts as you find them to be.

Shortly thereafter, the court returned to the subject of the standard of care, reiterating

In this case, defendants Raymond Gutierrez, M.D., and Southwestern Emergency Physicians, P.C., may not be held liable unless plaintiffs prove by clear and convincing evidence that Dr. Gutierrez's actions showed gross negligence in his care and treatment of Mr. Quinney. If the defendant physician in the treatment and care of his patient should use at least slight diligence, then the defendant physician

17

would not be grossly negligent and there could be no finding of liability.

. . .

These instructions were "adjusted to the evidence, apt, and a correct statement of the applicable law."[14] And given these instructions, coupled with the trial court's explanation that remarks by counsel do not amount to evidence, we cannot conclude that the jury was either confused or mislead into believing it could find Gutierrez liable under an ordinary-negligence standard.[15] Accordingly, the trial court's initial refusal to preclude any reference to the ordinary-negligence standard did not constitute reversible error.

---

[14] *Curry v. Dep't of Transp.*, 341 Ga. App. 482, 484 (801 SE2d 95) (2017) (punctuation omitted).

[15] *See Lewis v. Van Anda*, 282 Ga. 763, 767-68 (5) (653 SE2d 708) (2007) (holding that because trial court actually gave part of a jury charge that appellant claimed was improperly omitted and because remainder of court's charge adequately defined one of the legal terms at issue, the court's jury charge taken as a whole was not misleading and did not constitute reversible error); *Howland*, 324 Ga. App. at 182-83 (4) (holding that trial court's jury instructions on both gross negligence and ordinary negligence did not unduly emphasize the ordinary negligence standard and were not confusing or misleading). *Cf. Gielow v. Strickland*, 185 Ga. App. 85, 86-87 (1) (363 SE2d 278) (1987) (holding that trial court's error in allowing plaintiff's counsel to argue that jury should punish wrongful death defendant by entering large verdict against defendant was then compounded by trial court's confusing instruction to jury concerning punitive damages and, thus, required reversal of verdict in favor of plaintiff).

18

3. Gutierrez further contends that the trial court erred in instructing the jury that the gross-negligence standard of care, as outlined in OCGA § 51-1-29.5, also applied with regard to apportioning fault to non-parties under OCGA § 51-12-33 (c). Again, we disagree.

It is axiomatic that a jury charge, as noted *supra*, must be "adjusted to the evidence, apt, and a correct statement of the applicable law."[16] And because the review of allegedly erroneous jury instructions is a legal question, we "owe no deference to the trial court's ruling and apply the 'plain legal error' standard of review."[17]

Here, determining whether the trial court's charge constituted error requires examination of the interaction between OCGA §§ 51-1-29.5 and 51-12-33. Thus, tasked with interpreting statutory language, we necessarily begin our analysis with "familiar and binding canons of construction."[18] First and foremost, in considering

---

[16] *Wood v. B & S Enters., Inc.*, 314 Ga. App. 128, 130 (1) (723 SE2d 443) (2012) (punctuation omitted).

[17] *Wood*, 314 Ga. App. at 130 (1) (punctuation omitted).

[18] *Holcomb v. Long*, 329 Ga. App. 515, 517 (1) (765 SE2d 687) (2014); *accord Flanders v. Jackson*, 344 Ga. App. 493, 495 (1) (810 SE2d 656) (2018); *In the Interest of L. T.*, 325 Ga. App. 590, 591 (754 SE2d 380) (2014).

19

the meaning of a statute, our charge as an appellate court is to "presume that the [legislature] meant what it said and said what it meant."[19] And toward that end, we must afford the statutory text its plain and ordinary meaning,[20] consider the text contextually,[21] read the text "in its most natural and reasonable way, as an ordinary

---

[19] *Deal v. Coleman*, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013) (punctuation omitted); *accord Flanders*, 344 Ga. App. at 495 (1); *Holcomb*, 329 Ga. App. at 517 (1); *Martinez v. State*, 325 Ga. App. 267, 273 (2) (750 SE2d 504) (2013).

[20] *Deal*, 294 Ga. at 172 (1) (a); *accord Flanders*, 344 Ga. App. at 495-96 (1); *Holcomb*, 329 Ga. App. at 517 (1); *see also Tibbles v. Teachers Retirement Sys. of Ga.*, 297 Ga. 557, 558 (1) (775 SE2d 527) (2015) ("A statute draws it meaning, of course, from its text." (punctuation and citation omitted)); *Chan v. Ellis*, 296 Ga. 838, 839 (1) (770 SE2d 851) (2015) (same); *State v. Able*, 321 Ga. App. 632, 636 (742 SE2d 149) (2013) ("A judge is charged with interpreting the law in accordance with the original and/or plain meaning of the text at issue (and all that the text fairly implies). . . ."); *Singletary v. State*, 310 Ga. App. 570, 572 (713 SE2d 698) (2011) ("In construing these statutes, we apply the fundamental rules of statutory construction that require us to construe the statutes according to their terms, [and] to give words their plain and ordinary meaning. . . ." (punctuation omitted)).

[21] *See Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 10 (II) (B) (133 SCt. 2247, 186 LE2d 239) (2013) (Scalia, J.) ("Words that can have more than one meaning are given content, however, by their surroundings." (punctuation omitted)); *Deal*, 294 Ga. at 172 (1) (a) ("[W]e must view the statutory text in the context in which it appears[.]"); *see also Tibbles*, 297 Ga. at 558 (1) ("The common and customary usages of the words are important, but so is their context." (punctuation and citation omitted)); *Scherr v. Marriott Int'l, Inc.*, 703 F3d 1069, 1077 (II) (C) (2) (7th Cir. 2013) (Manion, J.) (noting that in statutory construction cases, courts "begin with the language of the statute itself and the specific context in which that language is used." (punctuation and citation omitted)).

speaker of the English language would,"[22] and seek to "avoid a construction that makes some language mere surplusage."[23] In summary, when the language of a statute is "plain and susceptible of only one natural and reasonable construction, courts must construe the statute accordingly."[24]

Turning to the statutes at issue, OCGA § 51-1-29.5 (c) provides:

> In an action involving a health care liability claim arising out of the provision of emergency medical care in a hospital emergency department or obstetrical unit or in a surgical suite immediately following the evaluation or treatment of a patient in a hospital emergency department, no physician or health care provider shall be held liable unless it is proven by clear and convincing evidence that the physician or health care provider's actions showed gross negligence.

And the section of the apportionment statute pertaining to non-parties, OCGA § 51-12-33 (c), provides: "In assessing percentages of fault, the trier of fact shall consider

---

[22] *Deal*, 294 Ga. at 172-73 (1) (a); *accord Holcomb*, 329 Ga. App. at 518 (1).

[23] *In the Interest of L.T.*, 325 Ga. App. at 592 (punctuation omitted); *accord Holcomb*, 329 Ga. App. at 518 (1).

[24] *Holcomb*, 329 Ga. App. at 518 (1) (punctuation omitted); *accord Luangkhot v. State*, 292 Ga. 423, 424 (1) (736 SE2d 397) (2013); *see also Deal*, 294 Ga. at 173 (1) (a) ("[I]f the statutory text is clear and unambiguous, we attribute to the statute its plain meaning, and our search for statutory meaning is at an end." (punctuation omitted)).

the fault of all persons or entities who contributed to the alleged injury or damages, regardless of whether the person or entity was, or could have been, named as a party to the suit."

In this matter, during the charge conference and after Quinney's counsel withdrew their contention that ordinary negligence would possibly apply to certain aspects of the case, Gutierrez's counsel advocated for the trial court to instruct the jury to apply an ordinary-negligence standard of care in apportioning fault to non-parties. In support of such a charge, Gutierrez's counsel argued that OCGA § 51-1-29.5 only limited the liability of defendants but did not apply with regard to apportioning fault to non-parties under OCGA § 51-12-33 (c). Quinney's counsel disagreed, arguing that the court should instruct the jury that a gross-negligence standard of care applied for apportioning fault to non-parties. The trial court agreed with Quinney and ruled that it would instruct the jury to apply the gross-negligence standard for apportioning fault to any non-party providing Quinney with emergency care. And following closing arguments, the trial court instructed the jury regarding this issue as follows:

> In the event you award a verdict for damages in favor of plaintiffs in this case, under Georgia law, you shall consider the issue of the

22

percentages of fault, if any, of the defendants and certain non-parties to this case, including Michael Baldwin, M.D., Nurse David Stalvey, Nurse Elizabeth Kenja and the nurses' employer, Phoebe Putney Memorial Hospital Inc. In assessing percentages of fault, the jury, as trier of fact, shall consider the fault of all persons or entities who contributed to the alleged injury or damages, regardless of whether the person or entity was, or could have been, named as a party to the lawsuit. In this case, when considering the issue of fault of these non-parties, Dr. Baldwin, Nurse Stalvey, Nurse Kenja and Phoebe Putney Memorial Hospital Inc., defendants have the burden of proof on this issue of non-party fault. As to non-party Nurses Stalvey and Kenja and their employer, Phoebe Putney Memorial Hospital Inc., defendants must prove by clear and convincing evidence that these nurses were grossly negligent in their nursing care of Douglas Quinney and that such gross negligence was a deviation from the nursing standard of care and must prove by a preponderance of the evidence that any such gross negligence proximately caused injuries to plaintiffs.

Then, after instructing the jury that it first must determine whether Baldwin provided emergency care, the trial court charged:

If you make such a finding that Dr. Baldwin was providing Mr. Quinney emergency medical care in a hospital emergency department, then on the issue of proof of non-party percentages of fault, defendants must prove by clear and convincing evidence that Dr. Baldwin was grossly negligent in his medical care of Mr. Quinney and must show by

23

a preponderance of the evidence that such gross negligence proximately caused injuries to Mr. Quinney. . . .

On appeal, Gutierrez reiterates his contention that OCGA § 51-1-29.5 (c) does not apply with regard to apportioning fault to non-parties under OCGA § 51-12-33 (c). Specifically, Gutierrez argues that OCGA § 51-1-29.5 (c) does not modify any essential elements of a tort against an emergency medical provider, or even reference, duty but, rather, provides such personnel with a form of immunity by limiting their liability. Armed with this premise, Gutierrez then contends that because OCGA § 51-12-33 (c) requires only a finding of "fault" of the non-party generally, regardless of whether the non-party has any affirmative defense or claim of immunity with regard to liability to the plaintiff,[25] the trial court erred in instructing the jury that it had to find the non-parties grossly negligent in order to apportion them fault. This argument is a nonstarter.

Gutierrez's attempt to divorce the concept of duty from the gross-negligence standard of care outlined in OCGA § 51-1-29.5 and claim the latter does not effectively modify the elements of a tort claim under the statute strains credulity and finds no support in our case authority. Within the context of a tort action generally,

_____

[25] *See* OCGA § 51-12-33 (c).

duty is defined as "[a] legal relationship arising from a standard of care, the violation of which subjects the actor to liability."[26] And the threshold issue in any cause of action for negligence is whether, and to what extent, "the defendant owes the plaintiff a duty of care."[27] Moreover, it is well settled that "[i]n order to establish medical malpractice, the evidence presented by the patient must show a violation of the degree of care and skill required of a physician."[28] Such standard of care has been defined as "that which, under similar conditions and like circumstances, is ordinarily employed by the medical profession generally."[29]

---

[26] Black's Law Dictionary 523 (7th ed. 1999).

[27] *Martin v. Ledbetter*, 342 Ga. App. 208, 211 (1) (802 SE2d 432) (2017) (punctuation omitted).

[28] *Cope v. Evans*, 329 Ga. App. 354, 355 (765 SE2d 40) (2014) (punctuation omitted); *see Zwiren v. Thompson*, 276 Ga. 498, 499 (578 SE2d 862) (2003) (noting that the essential elements to establish liability in a medical malpractice action are "(1) the duty inherent in the doctor-patient relationship; (2) the breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure be the proximate cause of the injury sustained." (punctuation omitted)); *see also* OCGA § 51-1-27 ("A person professing to practice surgery or the administering of medicine for compensation must bring to the exercise of his profession a reasonable degree of care and skill. Any injury resulting from a want of such care and skill shall be a tort for which a recovery may be had.").

[29] *Smith v. Finch*, 285 Ga. 709, 711 (1) (681 SE2d 147) (2009) (punctuation omitted); *accord Cope*, 329 Ga. App. at 355.

But in contrast, OCGA § 51-1-29.5 (c) requires a patient to show that the medical provider's treatment constituted gross negligence. And as used in that statute,

> gross negligence is the absence of even slight diligence, and slight diligence is defined in OCGA § 51-1-4 as that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances. In other words, gross negligence has been defined as equivalent to (the) failure to exercise even a slight degree of care, or lack of the diligence that even careless men are accustomed to exercise.[30]

Thus, a showing of gross negligence necessarily equates to showing a breach of a duty of even slight care.[31] Accordingly, under the plain language of OCGA § 51-1-29.5, an emergency medical provider's legal duty to a patient has indeed been effectively modified to that of only slight care.[32]

---

[30] *Johnson v. Omondi*, 294 Ga. 74, 77-78 (751 SE2d 288) (2013) (punctuation omitted); *accord Abdel-Samed v. Dailey*, 294 Ga. 758, 765 (3) (755 SE2d 805) (2014); *Quinney*, 325 Ga. App. at 117 (2); *see* OCGA § 51-1-4 ("In general, slight diligence is that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances. . . .The absence of such care is termed gross negligence.").

[31] *See supra* note 30.

[32] *See Johnson*, 294 Ga. at 78 (noting that under, OCGA § 51-1-29.5, the fact finder will be required to determine issues of gross negligence and slight diligence); *Quinney*, 325 Ga. App. at 118 (2) (noting that, under OCGA § 51-1-29.5 (c), a plaintiff has the burden of showing that the medical provider's treatment constituted

gross negligence or lack of slight diligence); *Pottinger v. Smith*, 293 Ga. App. 626, 628 (293 Ga. App. 626) (2008) (holding that OCGA § 51-1-29.5 requires a patient to prove that emergency department physician's treatment constituted gross negligence which "has been defined as equivalent to the failure to exercise even a slight degree of care" (punctuation omitted)). In support of his argument that OCGA § 51-1-29.5 "does not modify any essential elements of a tort against a healthcare provider working in an emergency department," Gutierrez cites *Robles v. Yugueros*, 343 Ga. App. 377 (807 SE2d 110) (2017), in which this Court noted that nothing in the ER statute "purports to change the accepted standard of care for any medical professional." *Id.* at 386 (2) (b). Setting aside the fact that *Robles* concerned the admission of medical expert testimony and not a substantive application of the ER statute, Gutierrez exaggerates the weight borne by the aforementioned observation, which was based on Justice Blackwell's concurring opinion in *Johnson*, *supra*. *See id.* (citing *Johnson*, 294 Ga. at 81 (1) (Blackwell, J., concurring)). In that opinion, Justice Blackwell notes that he fully concurs with the Supreme Court's definition of gross negligence, but he laments that this common definition is not particularly helpful when applied to medical-malpractice cases, including ER-statute cases. *Johnson*, 294 Ga. at 79-80 (1). Noting that OCGA § 51-1-29.5, by its own terms, "did not divorce the generally accepted standards of medical care from the cases to which the statute applies[,]" Justice Blackwell advocates for another definition of gross negligence that accounts for the standard of medical care, as the common definition saddles the jury with the difficult task of understanding not only the degree of skill and care the medical profession generally would have exercised under similar circumstances" but also what a "careless and inattentive emergency physician would have done in similar circumstances." *Id.* at 81-82 (1). Toward that end, Justice Blackwell proposes that "gross negligence" in the medical malpractice context be defined as "carelessness manifestly materially greater than want of the degree of skill and care the medical profession generally would have exercised under similar circumstances." *Id.* at 82 (1) (punctuation omitted). Importantly, Justice Blackwell warns that "[n]o one should understand [this] concurring opinion to suggest that 'gross negligence' means something different in OCGA § 51-1-29.5 than elsewhere in the Code and case law." *Id.* at 84 (1). Given these particular circumstances, although Gutierrez is correct that OCGA § 51-1-29.5 did not alter the general standard of medical care as a baseline, even under a faithful adherence to Justice

27

Turning to the second prong of his argument, Gutierrez contends that having incorrectly determined that OCGA § 51-1-29.5 (c) modified the duty an emergency medical provider owes to a patient, the trial court's instruction that the jury could apportion fault to non-parties if it found that such parties were grossly negligent in their treatment of Quinney effectively conflated "fault," as the term is used in OCGA § 51-12-33 (c), with liability. Put another way, Gutierrez essentially argues that the trial court should have instructed the jury that it could assess fault to the non-parties if Gutierrez proved that they deviated at all from the standard of care. But despite the fact that Gutierrez's contention in this regard is belied by our determination that OCGA § 51-1-29.5 (c) did, in fact, modify an emergency medical provider's duty to a patient, we, nevertheless, further hold that the trial court's instruction comported with the term "fault" as used in OCGA § 51-12-33 (c).

As our Supreme Court has held, "[a]s used in subsection (c) . . . 'fault' that 'contributed to the alleged injury or damages' must refer to a breach of a legal duty in the nature of tort that is owed for the protection of the plaintiff, the breach of which

Blackwell's concurrence, the statute undoubtedly lowered to some extent an emergency healthcare provider's duty to adhere to that baseline. Indeed, had it not, the statute would be pointless.

is a proximate cause of his injury."[33] And this understanding of "fault" is "consistent with the usual and customary meaning of the term as used in a legal context."[34] Indeed, a "tortfeasor," after all, is simply "one who commits a tort."[35] Consequently,

> subsection (c) is most naturally and reasonably understood to require the trier of fact to consider any breach of a legal duty that sounds in tort for the protection of the plaintiff, the breach of which is a proximate cause of the injury about which he complains, whether that breach is attributable to the plaintiff himself, a defendant with liability, or another.[36]

Here, as discussed *supra*, the legal duty that the non-parties owed Quinney, under OCGA § 51-1-29.5 (c), was effectively one of slight care. Thus, given our Supreme Court's holding in *Zaldivar v. Prickett*, under OCGA § 51-12-33 (c), in order to apportion fault to the non-parties, Gutierrez was required to prove that they

---

[33] *Zaldivar v. Prickett*, 297 Ga. 589, 595 (1) (774 SE2d 688) (2015) (punctuation omitted); *accord Martin v. Six Flags Over Ga. II, L.P.*, 301 Ga. 323, 337 (III) (801 SE2d 24) (2017).

[34] *Zaldivar*, 297 Ga. at 596 (1); *see* Black's Law Dictionary 725 (10th ed. 2014) (defining "fault" as "[t]he intentional or negligent failure to maintain some standard of conduct when that failure results in harm to another person").

[35] *Zaldivar*, 297 Ga. at 596 (1); *see* Black's Law Dictionary 1718 (10th ed. 2014).

[36] *Zaldivar*, 297 Ga. at 596 (1).

breached that duty by providing grossly negligent medical treatment to Quinney, which proximately caused his injury.[37] Accordingly, the trial court did not err in instructing the jury that the gross-negligence standard of care applicable to determining whether Gutierrez was at fault as a defendant also applied with regard to apportioning fault to non-parties under OCGA § 51-12-33 (c).[38]

4. Finally, Gutierrez contends that the trial court erred in denying his request to include the hospital on the verdict form, as a separate entity from nurses Stalvey

---

[37] *See id.* at 600 (1) (holding that OCGA § 51-12-33 (c) requires the trier of fact "to consider the fault of all persons or entities who contributed to the alleged injury or damages, meaning all persons or entities who have breached a legal duty in tort that is owed with respect to the plaintiff, the breach of which is a proximate cause of the injury sustained by the plaintiff." (punctuation omitted)).

[38] As noted *supra*, the trial court instructed the jury to first decide if Baldwin rendered emergency care and that such finding would then determine the standard by which to apportion his percentage of fault, if any. But the verdict form did not indicate the jury's finding on that issue and only indicated that it found him to be 34 percent at fault. Gutierrez did not object to this aspect of the verdict form, and, thus, arguably waived any contention that the trial court's instruction pertaining to Baldwin constituted error. *See Bloodworth v. Bloodworth*, 277 Ga. App. 387, 389 (1) (b) (626 SE2d 589) (2006) ("In the absence of a verdict form requiring the jury to specify how it [found the defendants liable], the method by which a jury reaches a particular verdict is not a matter of which this Court can take judicial cognizance." (punctuation omitted). Nevertheless, given our holding that the trial court's instruction did not constitute error, we find it unnecessary to distinguish between the non-parties for the purposes of our analysis.

and Kenja, for apportionment of fault and in failing to instruct the jury accordingly. But this claim likewise lacks merit.

Toward the end of the charge conference, and well after the close of evidence, the trial court asked the parties if, for apportionment purposes, the hospital should be listed on the verdict form as a separate non-party or on the same lines as the two nurses as their employer. Gutierrez's counsel argued that the hospital should be listed separately, but he initially agreed with the trial court's conclusion that there was not a separate act of negligence alleged against the hospital that was independent of the acts of negligence alleged against the nurses Stalvey and Kenja. Nevertheless, a few minutes later, Gutierrez's counsel reasserted his request to list the hospital on the verdict form separately, but—pivoting from his earlier argument—claimed that there was evidence that the hospital, as a separate entity, delayed Quinney's transfer to Columbus Medical Center and that this delay contributed to the harm suffered by Quinney. But the trial court disagreed and denied Gutierrez's request, and the apportionment part of the verdict form read:

> "We the jury assess percentages of fault as follows (total of four lines equals 100%):
>
> . . .

31

% - Non-parties nurse David Stalvey and employer Phoebe Putney Memorial Hospital Inc.

% - Non-parties nurse Elizabeth Kenja and employer Phoebe Putney Memorial Hospital Inc.

On appeal, Gutierrez reasserts his contention that the trial court erred in refusing to list the hospital on the verdict form for apportionment purposes as a separate entity independent of its status as employer of the two nurses. In support of this argument, he cites to his own testimony, that he was unaware of the delay in transferring Quinney to Columbus Medical Center, and to the testimony of one of his experts, stating that such delay was not his responsibility. Gutierrez then concludes—in his appellate brief but not during trial—that responsibility for ensuring Quinney was promptly transferred lay with the hospital as employer of an unidentified charge nurse.

Gutierrez correctly asserts that under OCGA § 51-12-33 (c), "[i]n assessing percentages of fault, the trier of fact *shall consider* the fault of *all persons or entities* who contributed to the alleged injury or damages, regardless of whether the person or entity was, or could have been, named as a party to the suit."[39] Indeed, the statute

---

[39] Emphasis supplied.

is designed to "apportion damages among all persons or entities who contributed to the alleged injury or damages—even persons who are not and could not be made parties to the lawsuit[.]"[40] But importantly, the fault of a nonparty "cannot be considered for the purposes of apportioning damages without some competent evidence that the nonparty in fact contributed to the alleged injury or damages."[41] Indeed, were it otherwise, "there would be no limitation on the number of potential nonparties that a trial court would be required to include on the verdict form for purposes of assessing fault under OCGA § 51-12-33 (c)."[42]

Here, although there was testimony that Gutierrez was *not* responsible for the delay, there was no evidence that any specific non-party, who was not already on the verdict form,[43] *was* responsible for the delay in transferring Quinney to Columbus

---

[40] *Couch v. Red Roof Inns, Inc.*, 291 Ga. 359, 362 (1) (729 SE2d 378) (2012) (punctuation omitted).

[41] *Union Carbide Corp. v. Fields*, 315 Ga. App. 554, 559 (1) (b) (ii) (726 SE2d 521) (2012) (citation and punctuation omitted), *reversed on other grounds by Georgia-Pacific v. Fields*, 293 Ga. 499 (748 SE2d 407) (2013).

[42] *Id.* at 559 (1) (b) (ii) n.4.

[43] As Quinney notes in his appellate brief, documents admitted as exhibits at trial indicate that Nurse Kenja was the dispositioning nurse for Quinney and also—apparently in that capacity—removed him from the emergency department's tracking board at the time he was discharged. That same document also notes that

33

Medical Center. Gutierrez seemingly contends that evidence absolving him from responsibility in this regard necessarily implicates the hospital as an administrative entity, but "assumptions based on speculation are not evidence."[44] And indeed, this assumption derives solely from the argument of Gutierrez's counsel, as none of Gutierrez's witnesses even offered speculation as to the identity of the person or entity responsible for delay in transfer. Given these particular circumstances, Gutierrez presented no evidence on which to base apportionment of liability to the hospital as an entity separate and distinct from its role as employer of nurses Stalvey

Dougherty County EMS was responsible for transporting Quinney to Columbus Medical Center.

[44] *Lingo v. Early County Gin, Inc.*, ___ Ga. App. ___, Slip op. at 10 (1) (Case No. A18A0267; decided June 1, 2018); *see Ogletree v. Navistar Int'l Transp. Corp.*, 245 Ga. App. 1, 6 (1) (535 SE2d 545) (2000) (noting that inference founded on speculation "is without evidentiary value").

and Kenja.[45] Accordingly, the trial court did not err in denying Gutierrez's request to include the hospital separately on the verdict form.

For all these reasons, we affirm the trial court's judgment affirming the jury verdict and award of damages in favor of Quinney.

*Judgment affirmed. Doyle, P. J., and Mercier, J., concur.*

[45] *See McReynolds v. Krebs*, 307 Ga. App. 330, 335 (3) (705 SE2d 214) (2010) (holding that judgment on verdict holding defendant driver liable for entirety of damages award in action brought by injured passenger, rather than apportionment of damages award between driver and manufacturer of vehicle that passenger had been riding in at time of accident, was appropriate, when driver presented no evidence regarding manufacturer's liability). *Cf. Fields*, 315 Ga. App. at 558-59 (1) (b) (i) (holding that a defendant still must show that a settled entity contributed to the alleged injury or damages before its fault can be assessed by a trier of fact).